UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO. 04-CV-10616-JLT

CLEAR CHANNEL OUTDOOR, INC. and
LAMAR CENTRAL OUTDOOR, INC.,

　　　　Plaintiffs,

v.

PAUL PIETAL, WILLIAM T. HAYWARD, Jr.,
and DAVID VEATOR, in their official capacities
as Members, MASSACHUSETTS OUTDOOR
ADVERTISING BOARD,

　　　　Defendants.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

The defendants, Paul Pietal, William T. Hayward, Jr., and David Veator, in their official capacities as members of the Massachusetts Outdoor Advertising Board (collectively, "the Board") oppose the plaintiffs' motion for preliminary injunctive relief because the plaintiffs have no reasonable likelihood of succeeding on their First Amendment challenge to the Board's increased rates, which were adopted in May, 2003, after remaining static for over 12 years and which are reviewable by this Court under the "intermediate scrutiny" accorded governmental regulation of commercial speech. Next, the plaintiffs will not be irreparably harmed by the payment of the challenged fees because the fees will be refunded or credited at their option if they prevail. Finally, plaintiffs have failed to show that any harm to them would outweigh the public interest in enforcement of state and federal requirements concerning outdoor advertising and highway beautification. For these reasons, the plaintiffs' request for preliminary injunctive

relief should be denied.

## FACTS

1. <u>Regulation of Outdoor Advertising in Massachusetts</u>

The plaintiffs are two entities engaged in the business of outdoor advertising on billboards, signs, and other devices in Massachusetts. See First Amended Complaint & Defendants' Answer to First Amended Complaint ¶¶ 5, 6. To date, permits for approximately 3,951 outdoor advertising signs have been issued in Massachusetts to 67 outdoor-advertising license-holders; plaintiff Clear Channel Outdoor, Inc. ("Clear Channel"), holds 2,367 of these permits and plaintiff Lamar Central Outdoor, Inc. ("Lamar"), holds 466. Affidavit of Mary L. Burns ("Burns Aff."), submitted herewith, at ¶ 11. The Board is the Commonwealth agency charged with the duty of regulating outdoor advertising within the state and meeting the Commonwealth's obligations under cognate federal law, including the federal Highway Beautification Act, 23 U.S.C. § 131. See First Amended Complaint & Answer ¶¶ 3, 7; see also M.G.L. c. 16, § 14 (creating the Board).[1] The majority of the signs regulated by the Board are commercial in nature. Burns Aff. ¶ 17.

    a. <u>State and Federal Requirements</u>

The relevant sections (§§ 29-33) of Chapter 93 of the Massachusetts General Laws are entitled "Outdoor Advertising Signs and Devices Within Public View." These sections confer authority on the Board to "make, amend or repeal rules and regulations for the proper control and restriction of billboards, signs and other advertising devices . . . on public ways or on private property within public view of any highway, public park or reservation." M.G.L. c. 93, § 29.

---

[1] Copies of the relevant statutory sections are attached to this memorandum.

The Board "may prescribe permit fees, to be fixed with regard to the cost of administering this section . . . [which] need not be uniform throughout the commonwealth." Id. The chapter goes on to prescribe procedures for objecting to applications for sign permits, to prohibit certain types of signs, to exempt certain signs from the Board's regulation, and to govern abatement and removal of unlawful signs. See M.G.L. c. 93, §§ 30-33.

Chapter 93D of the Massachusetts General Laws is entitled, "Control of Outdoor Advertising Adjacent to the Interstate and Primary Highway Systems." This chapter imposes additional restrictions on outdoor advertising near U.S. highways. M.G.L. c. 93D, §§ 1-5. It also authorizes the Massachusetts Department of Highways to enter into agreements with the U.S. Secretary of Transportation concerning implementation of Title 23 of the United States Code, the Highway Beautification Act, with regard to outdoor advertising, safety rest areas, and information centers. See M.G.L. c. 93D, §§ 6-7.

In 1971, in accordance with section 7 of chapter 93D, the Commonwealth (through its Department of Public Works, predecessor agency to the Department of Highways) and the U.S. Secretary of Transportation (through the Federal Highway Administration) entered into an Agreement for Carrying Out National Policy Relative to Control of Outdoor Advertising in Areas Adjacent to the National System of Interstate and Defense Highways and the Federal-Aid Primary System ("Agreement"). Burns Aff. ¶ 2, Ex. A. The purpose of the Agreement, which remains in effect, is "to promote the reasonable, orderly and effective display of outdoor advertising while remaining consistent with National policy to protect the public investment on the Interstate and Federal-aid primary highways, to promote the safety and recreational value public travel and to preserve natural beauty." Id. at 1. By the Agreement, the Commonwealth

3

undertook to regulate the size, spacing, and lighting of outdoor "signs, displays and devices" within a designated proximity to federal highways, id. at 5-7, and does so through the implementation and enforcement of M.G.L. c. 93D. Id. at 1-2.

      b.      <u>Regulatory Requirements</u>

In accordance with its statutory authority, the Board has promulgated regulations for the "Control and Restriction of Billboards, Signs and Other Advertising Devices," at 711 Code of Massachusetts Regulations 3.00 et seq.[2] The regulations require that anyone seeking to engage in the business of outdoor advertising in the Commonwealth hold a license, renewable annually. 711 C.M.R. 3.02(1); 711 C.M.R. 3.03(1). Licenses may be revoked by the Board for cause at any time. License fees are set according to the number of permits granted under a license. 711 C.M.R. 3.03(1) (under challenged regulations, annual license fee is $2000 for 200 or fewer permits and $3000 for more than 200 permits).

A permit is also required for each sign erected or maintained by a licensee. 711 C.M.R. 3.02(2); 711 C.M.R. 3.03(2). Before issuing a permit, the Board requires certification from both municipal officials and authorized Department representatives that the proposed sign conforms to statutory requirements. See 711 C.M.R. 3.06; Appendix 1 and Appendix 2 to 711 C.M.R. 3.00. Permits are annually renewable, may be revoked for cause, and may not be transferred to another licensee without prior Board approval. 711 C.M.R. 3.02(2); 711 C.M.R. 3.03(2). Permit fees are calculated based on the size and type of the to-be-permitted sign. 711 C.M.R. 3.03(2) (setting forth permit fees for signs 1-100 square feet; 101-672 square feet; 673 square feet or larger; tri-vision signs; signs in bus shelters; and alternating-face signs).

---

[2] A copy of the regulations is attached to this memorandum.

4

Permits and licenses expire on December 31st of each calendar year. 711 C.M.R. 3.03. Renewal applications must be filed in September and October (respectively), along with the prescribed fees. Id. In fiscal year ("FY") 2002, total revenue from outdoor advertising license and permit fees was $466,833.30; in FY2003, total revenue was $504,109.60. Burns Aff. ¶ 12.

2. The Outdoor Advertising Board

The Board is located within the Massachusetts Highway Department ("Department"). See M.G.L. c. 16, § 14. Apart from a small amount earmarked for payment to Board members,[3] the Board does not have a budget separate from that of the Department. Burns Aff. ¶ 14. As required by statute, the Board appoints an Executive Director as "the administrative and executive officer in charge of all administrative and executive details." M.G.L. c. 16, § 14. This position is currently held by Mary L. Burns, who is contemporaneously employed as an Assistant Commissioner for the Department. Burns Aff. ¶ 1.

The Board's duties include accepting and acting on initial applications, renewal applications, amendment applications, bus-shelter applications, and transfer applications for licenses and permits; inspecting and monitoring existing signs to ensure continuing compliance with statutory and regulatory requirements; removal of non-complying or abandoned signs; and meeting reporting requirements to the Legislature and the Commissioner of Highways. See M.G.L. c. 16, § 14; 711 C.M.R. 3.00 et seq; Burns Aff. ¶¶ 15-16.

---

[3] M.G.L. c. 16, § 14, requires that the three Board members be reimbursed expenses incurred in connection with their Board duties and that Board members who are not Commonwealth employees be paid a fixed amount "for each day spent in the performance of . . . official duties."

5

3.     <u>The Challenged Fees</u>

Prior to the increase challenged here, the Board's license and permit fees had not increased since November 9, 1990. Burns Aff. ¶ 6, Exs. D and E.[4] On January 30, 2003, the Board, through its Executive Director, filed emergency regulations amending the fees to the current levels being challenged by the plaintiffs. Burns Aff. ¶ 4. In accordance with M.G.L. c. 30A, § 2, a public hearing was held on May 2, 2003, in which representatives of the plaintiffs and other licensees participated. Burns Aff. ¶ 5, Ex. C. Following this hearing, the emergency regulations were adopted as permanent regulations and appeared as such in the Massachusetts Register on May 23, 2003. Burns Aff. ¶¶ 4-5.

At their request, the plaintiffs and one other licensee, Callahan Outdoor Inc., were permitted to pay their fees on a staggered basis. Burns Aff. ¶ 10. These three licensees paid their license fees and one-half of their permit fees in April, 2004, with the remaining one-half of the permit fees due on or before June 30, 2004. <u>Id.</u> This staggered schedule was permitted as a courtesy to these three licensees upon their request because similar flexibility has been afforded on occasion to other licensees in the past. <u>Id.</u> Under the challenged regulations, Clear Channel has a total estimated FY2004 fee obligation of $514,980.00, with a balance of $ 252,720.00 due June 30, 2004; Lamar has a total FY2004 fee obligation of $83,720.00, with a balance of $ 40,360.00 due June 30. <u>Id.</u> ¶¶ 10, 13. Once the outstanding permit fees are paid by Clear Channel, Lamar, and Callahan, total FY2004 revenue from license and permit fees is expected to be $916,070.00. <u>Id.</u> ¶ 13. To date for FY2004, $600,950.00 has been received by the Board. <u>Id.</u>

---

[4] A new type of sign ("tri-vision") was added to the Board's regulations in 1996 with a new fee pertaining to permits for that type of sign. Burns Aff. ¶ 6, Ex. E.

6

¶ 12.

The Board has represented to the plaintiffs that, if the challenged regulations are ultimately invalidated on First Amendment grounds, the Board will return the excess fees collected under the regulations – either in the form of a refund or a credit against future fees. Burns Aff. ¶ 18. The Board remains willing to do this. Id.

ARGUMENT

THE PLAINTIFFS HAVE NOT DEMONSTRATED
ENTITLEMENT TO AN ORDER PRELIMINARILY
ENJOINING OPERATION OF 711 C.M.R. 3.03

In order to obtain a preliminary injunction, the plaintiffs must show that "they will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting the relief would inflict on the defendant; (3) that plaintiff[s have] exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." Foxboro Co. v. Arabian American Oil Co., 805 F.2d 34, 36 (1st Cir. 1986); see also Lanier Professional Serv. Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999).[5] The plaintiffs here cannot make these showings so their request should be denied.

I. THE PLAINTIFFS WILL NOT BE IRREPARABLY HARMED
BY PAYING THE INCREASED PERMIT FEES BECAUSE
THEY WILL BE REFUNDED OR CREDITED THOSE FEES
IF THE REGULATIONS ARE ULTIMATELY INVALIDATED.

Generally, the payment of money does not constitute irreparable harm for preliminary-injunction purposes because the money may be recovered following resolution of the case on the

---

[5] Because the defendant is an agency of the Commonwealth implementing a state statute, the second test for appropriateness of a preliminary injunction discussed above--harm to the defendant--collapses into the fourth test--harm to the public interest--and is not addressed separately in this memorandum.

7

merits. DeNovellis v. Shalala, 135 F.3d 58, 63 (1st Cir. 1998). The plaintiffs correctly point out that they would be barred by the Eleventh Amendment to the U.S. Constitution from suing the Commonwealth for the return of the fees in this or any other federal court. See Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pltf. Mem.") at 13-15. The Commonwealth has, however, agreed to return any fees ultimately judicially invalidated as impermissible under constitutional requirements. Burns Aff. ¶ 18. The fees would be returned--at the licensees' option--in the form of a refund or a credit against future fees. Id. Therefore, the plaintiffs will not be irreparably harmed by paying the increased fees.

Moreover, the plaintiffs' delay in filing this case undercuts their claims of immediate, irreparable harm. See Fritz v. Arthur D. Little, Inc., 944 F. Supp. 95, 98 (D. Mass. 1996). The plaintiffs have been aware since May 2, 2003, of the increased fees, but did not file this case until March 29, 2004, and did not seek preliminary injunctive relief until June 1, 2004. To the extent the plaintiffs claim that the rate increases are not constitutionally permissible, they could have sought relief a year ago. In the interim, all but one of the other licensees have paid their fees as required. Burns Aff. ¶ 10. If paying the fee increases threatens Clear Channel's or Lamar's business operations, they could have been expected to seek preliminary relief well before now. Their failure to do so calls any claims of immediate and irreparable harm into question.

Plaintiffs' claim that the constitutional nature of their claims makes imposition of the increased fees *per se* irreparable harm should be rejected. See Pltf. Mem. 12-13. The cases they cite do not involve commercial speech, which as discussed below, is entitled to a lesser degree constitutional protection than "core" First Amendment speech. See Elrod v. Burns, 427 U.S. 347

(1976) (claim by public employees that they were discharged or threatened with discharge on the basis of political affiliation); Feliciano v. Gaztambide, 836 F.2d 1 (1st Cir. 1987) (claim of demotion of public employee on the basis of political affiliation); In the Matter of Providence Journal Co., 820 F.2d 1342 (1st Cir. 1986) (claim of prior restraint on newspaper publication); Westfield High School L.I.F.E. Club v. City of Westfield, 249 F. Supp. 2d 98 (D.Mass. 2003) (claim of student discipline for engaging in Bible-club activities); Demarest v. Athol/Orange Community Television, Inc., 188 F. Supp. 2d 82 (D. Mass. 2002) (claim of suspension of local cable-access program for criticism of local politician's activities); South Boston Allied War Veterans' Council v. City of Boston, 875 F. Supp. 891 (D.Mass. 1995) (claim that parade permit conditioned on allowing gay-lesbian group to march). In contrast, this case involves no claim that protected speech is being chilled or controlled in any way but rather is simply a challenge to regulatory fees on advertising mechanisms. The plaintiffs have not shown irreparable harm--*per se* or otherwise--and their motion for a preliminary injunction should be denied.

    II.    THE PLAINTIFFS HAVE NOT DEMONSTRATED REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGE TO THE LICENSE AND PERMIT FEES, WHICH ARE REVIEWABLE UNDER THE INTERMEDIATE SCRUTINY STANDARD APPLICABLE TO COMMERCIAL SPEECH.

Regulation of outdoor advertising is within the traditional police powers of the States, subject only to constitutional limitations. See, e.g., Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 502-505 (1981) (plurality) (rejecting First Amendment challenge to ban on commercial billboard advertising). If advertising carried on plaintiffs' signs is entitled to constitutional protection, it is evaluated as "commercial" speech only, and not accorded the broader protections granted to political or noncommercial speech. See Virginia Bd. of Pharmacy v. Virginia Citizens

Consumer Council, Inc., 425 U.S. 748, 762 (1976). "'[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 477 (1989), quoting Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 456 (1978). Plaintiffs incorrectly argue for strict scrutiny review, citing cases outside the area of commercial speech. See Pltf. Mem. at 5-8; Murdock v. Pennsylvania, 319 U.S. 105 (1943) (religious solicitation); Cox v. New Hampshire, 312 U.S. 569 (1941) (religious "information march"); Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301 (11th Cir. 2003) (adult entertainment); Sentinel Communications Co. v. Watts, 936 F.2d 1189 (placement of newspaper racks); AAK v. City of Woonsocket, 830 F. Supp. 99 (D.R.I. 1993) (adult entertainment); Wendling v. City of Duluth, 495 F. Supp. 1380 (D. Minn. 1980) (adult bookstores); Bayside Enterprises, Inc. v. Dale Carson et al, 450 F. Supp. 696 (M.D. Fla. 1978) (adult entertainment); Moffett v. Killian, 360 F. Supp. 228 (D. Conn. 1973) (legislative lobbying).

Challenges to regulations involving commercial speech, such as those at issue here, are governed by the "intermediate scrutiny" framework established in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980). This test inquires:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

10

Central Hudson, 447 U.S. at 566; see also Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 554 (2001) (applying Central Hudson in commercial-speech case involving cigarette advertising); Greater New Orleans Broadcasting Ass'n., Inc. v. United States, 527 U.S. 173, 184 (1999) (applying Central Hudson in commercial-speech case involving advertising of private casino gambling). In both cases, the Court found "no need to break new ground" in the case before it, and proceeded to apply the four part Central Hudson test. 533 U.S. at 554; 527 U.S. at 184; see also South-Suburban Housing Center v. Greater South Suburban Board of Realtors, 935 F.2d 868, 889, 896 (7th Cir. 1991) (applying Central Hudson test to evaluate constitutional challenge to bylaws governing real-estate solicitation and "for sale" signs).

Under Central Hudson, plaintiffs must first establish that the challenged law affects constitutionally protected speech. Id. If this burden is met, the government then bears the burden of justifying the restriction on commercial speech. Edenfield v. Fane, 507 U.S. 761, 770 (1993). The government need not show that it has chosen the "least restrictive means" to advance its interest; rather, the government's approach must reasonably "fit" the concern addressed. Fox, 492 U.S. at 480. Thus, commercial speech may be limited, or prohibited, where the Central Hudson test is met. See, e.g., Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995).

Although Central Hudson and its progeny require "a fit that is not necessarily perfect, but reasonable" between the state regulation being scrutinized and the goals of that regulation, Fox, 492 U.S. at 480, the plaintiffs would have this Court impose a "perfect fit" test. See Pltf. Mem. at 6 (arguing that the First Amendment imposes "severe" constraints on Board's regulatory authority); 8 (Board must demonstrate that license and permit fees are "necessary to recoup" the actual costs of administering the licensing and permitting program"). The cases cited by the

11

plaintiffs for this proposition, however, do not apply to the regulation of outdoor advertising, which is largely commercial in nature. Burns Aff. ¶ 17. In <u>Metromedia</u>, the U.S. Supreme Court demonstrated the different levels of protection accorded commercial and non-commercial speech. 453 U.S. at 512, 521 (concluding that challenged ordinance was constitutionally sound as applied to commercial speech but not as applied to non-commercial speech). The applicable test here is less stringent than the plaintiffs assert and does not, alone, permit the inference that the challenged fees are unconstitutional or likely to be found so.

Plaintiffs provide no information about the actual costs of regulating outdoor advertising in Massachusetts, which includes monitoring signs for compliance and removing unlawful or unsafe signs. Plaintiffs provide no information about the budget of the Massachusetts Highway Department and what proportion of the Department's resources are used to meet the Board's obligations. As demonstrated by the Burns Affidavit, the Board does not have a budget separate from the Department, except for a $2000 set-aside for payments to Board members. Ensuring compliance with federal and state outdoor advertising requirements requires more than simply reimbursing Board member expenses. <u>See</u> Burns Aff. ¶¶ 15-16 (detailing duties and activities of the Board).

This Court may presume that a substantial increase in outdoor advertising license and permit fees was warranted after over 12 years without one. <u>See</u> Burns Aff. ¶ 6. The Commonwealth should be permitted the opportunity to present evidence on the merits of the constitutional validity of the fee increases. <u>See</u> <u>Florida Bar</u>, 515 U.S. at 627-629. The plaintiffs have not sustained their burden at the preliminary-injunction stage of demonstrating a reasonable likelihood of success on the merits of their claim.

### III.   ENJOINING COLLECTION OF THE INCREASED FEES IS NOT IN THE PUBLIC INTEREST.

The plaintiffs have likewise failed to show that relieving them of the obligation to pay the challenged license and permit fees would further the interests of the citizens of Massachusetts. Regulation of outdoor advertising has been recognized as an important exercise of a state's police power. See Metromedia, Inc., 453 U.S. at 507-508. It would be contrary to the public interest for this Court to enjoin the operation of a duly adopted regulation implementing valid statutory requirements concerning outdoor advertising and highway beautification. See Agency Rent-A-Car, Inc. v. Connolly, 686 F.2d 1029, 1035 (1st Cir. 1982) (enjoining enforcement of a valid state statute "obviously" adversely affects the public interest). For this reason also, the requested preliminary injunction should be denied.

CONCLUSION

Because the plaintiffs have not shown that the injunction they seek is in the public interest, that they will suffer irreparable harm without it, or that they are reasonably likely to succeed on the merits of any of their claims, this Court should deny their Motion for Preliminary Injunction.

Respectfully submitted,

PAUL PIETAL, WILLIAM T. HAYWARD, Jr., and DAVID VEATOR, in their official capacities as Members, MASSACHUSETTS OUTDOOR ADVERTISING BOARD,

By their attorney,

THOMAS F. REILLY
ATTORNEY GENERAL


Juliana deHaan Rice, B.B.O. No. 564918
Assistant Attorney General
Government Bureau
Office of the Attorney General
One Ashburton Place, Room 2019
Boston, Massachusetts 02108-1698
(617) 727-2200, ext. 2062
fax 617-727-5785

Date: June 23, 2004



CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 6/23/04.